# UNITED STATES DISTRICT COURT

## DISTRICT OF RHODE ISLAND

THE ROYAL BANK OF SCOTLAND, N.V

Plaintiff

v.

M/T STAVRODROMI, her engines, tackle, appurtenances, etc., *in rem*, and WALL SHIPMANAGEMENT

Defendants

(ADMIRALTY)

11-cv- 00372 (ML)(LDA)

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR INTERLOCUTORY SALE

NOW COMES Plaintiff, THE ROYAL BANK OF SCOTLAND, N.V.[1] ("**RBS**"), through undersigned counsel, who submits the subject Memorandum in support of its motion of an Order directing the sale of M/T STAVRODROMI (the "**Vessel**") pursuant to Rule E(9)(b) of the Supplemental Rules for Admiralty or Maritime Claims & Asset Forfeiture Actions of the Federal Rules of Civil Procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

The Vessel was the subject of a previous action before the Court captioned *N.E. Vernicos - Argonaftis Salvage and Towage Consortium et al. v. Ocean Tankers Holdings Public Company Limited et al.*, assigned docket number 1:10-cv-00441 (ML)(LDA) (the "**First Litigation**"). This prior action was commenced on or about October 28, 2010 subsequent to the arrival of the Vessel within the District. The First Litigation was settled in late April, 2011, but the Vessel has remained in the District.

Plaintiff RBS intervened in the First Litigation when the Plaintiffs in that action moved the Court to sell the Vessel. The basis for Plaintiff's intervention in the First Litigation is a Foreign

---

[1] Plaintiff was formerly known as "ABN AMRO BANK N.V.".

Preferred Ship Mortgage over the Vessel, but in light of the settlement reached between the Plaintiffs and Defendants in the First Litigation, Plaintiff RBS did not continue with the case.

Subsequently, the registered owner of the Vessel, Wall Shipmanagement ("**Wall**" or "**Owner**") defaulted on its obligations to Plaintiff RBS, as more fully detailed below. Accordingly, Plaintiff RBS filed a Verified Complaint (hereinafter "Verified Complaint") against the Defendants on August 17, 2011, and proceeded to arrest the Vessel the next day. Plaintiff RBS also moved the Court to appoint a substitute custodian, which motion was granted.

By motion dated October 6, 2011, two potential intervening plaintiffs have sought leave to file Intervening Complaints.

Defendants have not answered or otherwise responded to the Verified Complaint, although the time to do so has long since expired. Thus, the allegations of the Verified Complaint are uncontested. Counsel for Wall Shipmanagement in the First Litigation was provided with the Verified Complaint and supporting papers, but has subsequently moved the Court to withdraw as counsel of record. The Court granted this motion by Order dated October 13, 2011.

## THE LOAN & SWAP AGREEMENTS

By a Loan Agreement originally dated October 16, 2007, as amended and restated pursuant to a Seventh Supplemental Agreement dated July 7, 2010 (the "**Loan Agreement**") between Plaintiff RBS, Ocean Tankers Holdings Public Company Limited ("**Ocean Tankers**")[2], Defendant Wall Shipmanagement, and certain other subsidiaries of Ocean Tankers, Ocean Tankers opened a loan facility of (originally) $284,000,000 with a group of banks and financial institutions (the "**Lenders**"). Verified Complaint ¶ 6. Plaintiff RBS functioned at all relevant times as arranger, agent, swap bank, security agent and account bank, handling the details of the transaction

---

[2]   The Loan Agreement provides that Ocean Tankers is the sole owner of a number of special purpose companies, including Defendant Wall Shipmanagement each owning a separate vessel. The Loan Agreement provided Ocean Tankers with funds used to purchase these vessels. Each subsidiary provided Plaintiff RBS with a guarantee of the Loan Agreement and a Mortgage over the vessel purchased with the funds advanced under the Loan Agreement.

memorialized in the Loan Agreement on behalf of the Lenders (RBS is also a Lender).[3]   Verified

Complaint ¶ 6.  The various financing parties are defined in the Loan Agreement as the "Creditors".

Pursuant to the Loan Agreement, the Lenders made advances to Ocean Tankers in an aggregate

amount of $269,147,237.28 outstanding as of July 25, 2011 (the "**Loan**").  Verified Complaint ¶ 6.

A true and correct copy of the Loan Agreement is attached to the Verified Complaint as Exhibit 1.

In addition to the Loan Agreement, Plaintiff RBS and Ocean Tankers entered into an

International Swap Dealers Association Master Swap Agreement dated as of October 16, 2007 (the

"**Swap Agreement**").  Verified Complaint ¶ 7.  A true and correct copy of the Swap Agreement is

attached to the Verified Complaint as Exhibit 2.  The Swap Agreement allowed the parties to protect

against certain currency fluctuations, with periodic payments (the "**Swap Payments**") due to RBS in

its capacity as swap bank.  Verified Complaint ¶ 8.

The Loan Agreement and Swap Agreement were secured, *inter alia*, by guarantees (each, a

"**Guarantee**") in favor of RBS as security agent for the Lenders by the various wholly-owned Ocean

Tankers subsidiaries, including a Guarantee by Defendant Wall Shipmanagement dated October 3,

2008 (the "**Wall Shipmanagement Guarantee**")[4].  Verified Complaint ¶ 9.  A true and correct copy

of the Wall Shipmanagement Guarantee is attached to the Verified Complaint as Exhibit 3.  Under

the Wall Shipmanagement Guarantee, Wall Shipmanagement unconditionally guaranteed to RBS, as

Security Agent, Ocean Tankers' obligations and liabilities to the Lenders and the Swap Bank.

Verified Complaint, Exhibit 3, clause 2.  Verified Complaint ¶ 10.

As further security for the Loan Agreement and the Swap Agreement and pursuant to, and as

security for, the Wall Shipmanagement Guarantee, Wall Shipmanagement executed a Deed of

---

[3]   This type of arrangement is common with a syndicated loan facility, such as the one in the instant matter.  The Security Agent typically acts as the representative of the lenders to the borrower and holds certain security in favor of the lenders to secure the loan.  This structure permits the participation of a large number of banks, which in turn facilitates the raising of significant amounts of capital, such as the $284,000,000 loan asserted herein.

[4]   Pursuant to clause 7.3 of the Seventh Supplemental Agreement dated July 7 2010, Defendant Wall Shipmanagement confirmed that the Wall Shipmanagement Guarantee covers the amended and additional obligations of the Borrower under the Loan Agreement as amended and restated.

Covenant and Mortgage dated October 3, 3008 (the "**Wall Shipmanagement Deed**") in favor of RBS. Verified Complaint ¶ 11. A true and correct copy of the Wall Shipmanagement Deed is attached to the Verified Complaint as Exhibit 4. The Wall Shipmanagement Deed requires Wall Shipmanagement to, *inter alia*, provide a mortgage to RBS as security agent for the Lenders. Verified Complaint, ¶ 12, Exhibit 4, clause 3.

Defendant Wall Shipmanagement granted RBS a First Priority Maltese Ship Mortgage dated October 3, 2008 and amended July 16, 2010 (the "**First Priority Ship Mortgage**"). Verified Complaint ¶ 13. A true and correct copy of the First Priority Ship Mortgage is attached to the Verified Complaint as Exhibit 5. The First Priority Ship Mortgage was filed for record with the Registrar of Ships in Valletta, Malta on October 3, 2008 at 1225 hours, local time, and the amendment was filed for record on July 16, 2010 at 1141 hours, local time. Verified Complaint, ¶ 14, Exhibit 5.

## THE EVENTS OF DEFAULT

### *Ocean Tankers Defaults Under the Loan Agreement*

Ocean Tankers has defaulted under the Loan Agreement by, *inter alia*, failing to pay interest instalments falling due under the Loan Agreement in an aggregate amount of, as of July 28, 2011, of $7,186,685.50. Verified Complaint ¶ 16. Each failure to make such payments is an event of default under clause 10.1.1 of the Loan Agreement. Verified Complaint ¶ 16. Ocean Tankers also failed to make a principal payment in the amount of $5,702,394.06, due on May 2, 2011. Verified Complaint ¶ 17. The failure to make this payment is a further event of default under clause 10.1.1 of the Loan Agreement. Verified Complaint ¶ 17. Ocean Tankers has also failed to make certain other payments, namely an agency fee payment of $120,000 and a restructuring fee of $350,000, both due October 31, 2010. Verified Complaint ¶ 18. The failure to make these payments constituted additional events of default under clause 10.1.1 of the Loan Agreement. Verified Complaint ¶ 18.

The defaults enumerated above triggered Ocean Tankers' obligation to pay default interest pursuant to clause 3.4.1 of the Loan Agreement, which Ocean Tankers failed to do, a further event of default under clause 10.1.1 of the Loan Agreement. Verified Complaint ¶ 19.

*Ocean Tankers Defaults Under the Swap Agreement*

In addition to its defaults under the Loan Agreement, Ocean Tankers has defaulted under the Swap Agreement by failing to make Swap Payments and by reason of the defaults under the Loan Agreement. As set out above, Ocean Tankers has defaulted under the Loan Agreement. These defaults were also defaults under sections 5(a)(iii)(1) and 5(a)(vi) of the Swap Agreement.

Ocean Tankers failed to make a Swap Payment of $3,282,076.35 due October 29, 2010. Verified Complaint ¶ 23. The failure to make this payment was a default under sections 5(a)(iii)(1) and 5(a)(vi) of the Swap Agreement and a further event of default under clauses 10.1.1 and 10.1.34 of the Loan Agreement. Verified Complaint ¶ 23. Ocean Tankers has also failed to make a Swap Payment of $3,407,191.92 due January 31, 2011. Verified Complaint ¶ 24. The failure to make this payment was a default under sections 5(a)(iii)(1) and 5(a)(vi) of the Swap Agreement and a further event of default under clauses 10.1.1 and 10.1.34 of the Loan Agreement. Verified Complaint ¶ 24. Ocean Tankers further failed to make a Swap Payment of $3,058,285.10, due April 28, 2011. Verified Complaint ¶ 25. The failure to make this payment was a default under sections 5(a)(iii)(1) and 5(a)(vi) of the Swap Agreement and a further event of default under clauses 10.1.1 and 10.1.34 of the Loan Agreement (each, a "**Default**" and, together with the Defaults under the Loan Agreement, the "**Events of Default**"). Verified Complaint ¶ 25.

## RBS ACCELERATES THE LOAN AND SWAP

Each of the Events of Default described above give RBS the right to take certain actions more fully described in clause 10.2.2 of the Loan Agreement, including, but not limited to, the right to accelerate the Loan and to terminate the Swap Agreement and declare all sums under the Loan

Agreement, Swap Agreement and the Wall Shipmanagement Guarantee immediately due and payable to RBS and the Lenders.   Verified Complaint ¶ 26.  Accordingly, by letter dated July 28, 2011, RBS notified Ocean Tankers and Wall Shipmanagement, *inter alia*, of the enumerated defaults and that RBS was exercising its right under clause 10.2.2 of the Loan Agreement to accelerate the Loan and other obligations, and that the sum of $280,174,322.35 was immediately due and payable under the Loan Agreement (the "**Acceleration Notice**").  Verified Complaint ¶ 27.  A true and correct copy of the Acceleration Notice is attached to the Verified Complaint as Exhibit 6.

Specifically, Ocean Tankers and Wall Shipmanagement are liable under the Loan Agreement and the Wall Shipmanagement Guarantee to RBS for at least the following amounts:

|   |   |   |
|---|---|---|
| a. | Accelerated principal of the Loan: | $263,444,843.22 |
| b. | Interest accrued from July 19 to July 25, 2011: | $116,771.93 |
| c. | Interest previously due and unpaid: | $7,186,685.50 |
| d. | Default interest on (c), above: | $167,205.68 |
| e. | May 2, 2011 Principal payment: | $5,702,394.06 |
| f. | Default interest on (e), above to 25 July 2011: | $62,378.37 |
| g. | Agency fee payment: | $120,000 |
| h. | Default interest on (g), above to 25 July 2011: | $4,254.79 |
| i. | Restructuring fee: | $350,000 |
| j. | Default interest on (i), above to 25 July 2011: | $12,409.80 |
| k. | Amount outstanding to the MPEA: | $3,000,0000 |
| l. | Interest on the MPEA: | $7,379.00 |
| | **LOAN AGREEMENT TOTAL:** | **$280,174,322.35** |

Verified Complaint ¶¶ 28 & 29.

Ocean Tankers and the various guarantors, including Wall Shipmanagement, are also liable to RBS for amounts owing under the Swap Agreement as of the date it was terminated. Verified Complaint ¶ 30. By letter dated July 28, 2011, RBS notified Ocean Tankers and the various guarantors, including Wall Shipmanagement, of Ocean Tankers' default under the Loan Agreement and the Swap Agreement and designated July 28, 2011 as an early termination date under section 6(a) of the Swap Agreement (the "**July 28, 2011 Early Termination Notice**"). Verified Complaint ¶ 31. A true and correct copy of the July 28, 2011 Early Termination Notice is attached to the Verified Complaint as Exhibit 7.

Subsequently, by letter dated July 29, 2011, RBS provided a statement to Ocean Tankers and the various guarantors, including Wall Shipmanagement, calculating and stating the amount owed to RBS by Ocean Tankers and the various guarantors, including Wall Shipmanagement (the "**July 29, 2011 Swap Statement**"). Verified Complaint ¶ 32. A true and correct copy of the July 29, 2011 Swap Statement is attached to the Verified Complaint as Exhibit 8. Specifically, Ocean Tankers and Wall Shipmanagement are liable under the Swap Agreement to RBS for the following amounts:

| | | |
|---|---|---|
| m. Loss amount: | | $38,977,000.00 |
| n. Unpaid amount: | | $9,810,435.16 |
| **SWAP AGREEMENT TOTAL:** | | **$48,787,435.16** |

Verified Complaint ¶¶ 33 & 34.

The Events of Default under the Loan Agreement, the Swap Agreement and the Wall Shipmanagement Deed triggered the obligations of Wall Shipmanagement under the Wall Shipmanagement Guarantee. RBS is accordingly entitled to foreclose on its security under the First Priority Ship Mortgage. Verified Complaint ¶ 35. By letters dated July 29, 2011, RBS made demands under the Wall Shipmanagement Guarantee (the "**Guarantee Demands**") for the defaults

under the Loan Agreement and Swap Agreement. Verified Complaint ¶ 36. A true and correct copy

of the Guarantee Demands is attached to the Verified Complaint as Exhibit 9.

Currently, Ocean Tankers and Wall Shipmanagement are liable to Plaintiff RBS in an

amount no less than $328,961,757.51. Verified Complaint ¶ 37. This liability is secured by the First

Priority Ship Mortgage, together with all further amounts which will become due and payable in the

future under the Loan Agreement, Swap Agreement, Wall Shipmanagement Guarantee, and other

agreements between the parties. Verified Complaint ¶ 37.

## LAW AND ARGUMENT

Rule E(9)(b) of the Supplemental Rules for Admiralty and Maritime Claims & Asset

Forfeiture Actions sets forth the criteria for the disposition of property and interlocutory sales as

follows:

> On application of a party . . . the court may order all or part of the
> property sold—with the sales proceeds, or as much of them as will
> satisfy the judgment, paid into court to await further orders of the
> court—if:
>
> > (A)     the attached or arrested property is perishable, or liable
> > to deterioration, decay, or injury by being detained in custody
> > pending the action;
> >
> > (B)     the expense of keeping the property is excessive or
> > disproportionate; or
> >
> > (C)     there is an unreasonable delay in securing release of the
> > property.

Fed. R. Civ. P., Supp Admiralty Rule E(9)(a)(i).

In a leading opinion widely cited in cases such as this, the Fifth Circuit held that to obtain an

order for an interlocutory sale, maritime lien holders need show only the existence of one of the

three criteria set forth in Rule (E)(9)(a)(i). *Merchants Nat'l Bank v. Dredge General G.L. Gillespie*,

663 F.2d 1338, 1341 (5th Cir. 1981) *cert. dismissed* 102 S.Ct. 2263, 456 U.S. 966, 72 L.Ed.2d 865.

It is respectfully submitted that all three factors have been met in this case.

First, it should be noted that Owner clearly does not intend to secure release of the Vessel, and has failed to appear in this action. In fact, Owner's counsel in the First Litigation has advised that it has not been retained in the instant matter, and has withdrawn as counsel of record for Owner in the First Litigation, even though the First Litigation ended over 6 months ago. The Owner has essentially abandoned the Vessel, and is making no provision for the welfare and safety of the Vessel. Given the delay in securing the release of the Vessel since its arrest and the fact that Owner clearly has no intention of securing her release, criteria (C) of Supplemental Admiralty Rule 9(a)(i) has been met.

Second, the expense of keeping the vessel in custody is excessive and is unnecessarily eroding the amount of sale proceeds which would be available to satisfy judgment in this case. Plaintiff has secured the services of a substitute custodian to maintain custody of the vessel for a fee. A crew also remains aboard the Vessel to maintain it pending its sale. As the Vessel remains under arrest, the related costs and fees are significant and continue to mount, currently running at the rate of over $200,000 per month, exclusive of crew wages and supplies (crew wages and supplies add a further approximately $50,000 per month in costs). Indeed, Plaintiff RBS has recently filed a Motion seeking the classification of $307,577.23 in expenses related to the Vessel and incurred between August 18 and September 30, 2011 as *custodia legis* expenses.

Because Owner has not acted, and apparently does not intend to act, to secure release of the Vessel, every dollar spent to maintain custody of the Vessel is a dollar spent unnecessarily and to the detriment of claimants against the Vessel. Money spent unnecessarily in maintaining custody of the Vessel is by definition excessive, and it is respectfully submitted that criteria (B) of Supplemental Admiralty Rule 9(a)(i) has thus been met.

Additionally, the Vessel is physically deteriorating in a number of respects. She is idle. She is of steel construction, and therefore requires regular maintenance of her hull and machinery, and

maintenance schedules have been disrupted. By sitting idle in the water, the Vessel is susceptible to decay and deterioration. Therefore, criteria (A) of Supplemental Admiralty Rule 9(a)(i) also has been met.

Plaintiff further requests that, in connection with the sale of the Vessel, a minimum price of $6,250,000 be set by the Court. In support of this figure, Plaintiff has retained the services of 2 well known and independent ship sale and purchase brokers to value the Vessel. Declaration of Mathias Kocher, dated November 21, 2011 ("**Kocher Dec.**") ¶ 3. The first valuation, obtained from Braemar Seascope Valuations, Ltd. ("**Braemar**"), estimates the value of the Vessel at $8,300,000. Id., ¶ 4 and Ex. 1. The second valuation, obtained from Clarkson Valuations Ltd. ("**Clarkson**") estimates the value of the Vessel at $8,000,000. Id., ¶ 5 and Ex. 2. By obtaining the arms-length valuations from Braemar and Clarkson, Plaintiff submits that the approximate value of the Vessel has been established for the purposes of this Motion. However, since the Vessel will be sold at a public auction, Plaintiff is aware that a lower minimum bid price should be set in order to attract as much interest as possible. Accordingly, Plaintiff respectfully requests that the Court set a minimum bid price of $6,250,000, representing approximately 78% of the lower of the two estimates.

Mindful that the U.S. Marshal Service's primary duties are other than marketing ocean-going tonnage such as the Vessel, Plaintiff has also retained the services of Clarkson to market the Vessel on a global basis. Kocher Dec. ¶ 6. Clarkson is one of the largest and most experienced ship brokers in the world, and has the ability to effectively market the Vessel to the shipping community around the world. Id. ¶ 6. The engagement of Clarkson to market the Vessel is likely to lead to the greatest possible exposure to possibly interested buyers and thus to result in the highest possible price at auction. Id. ¶ 7. It is respectfully submitted that the engagement of Clarkson by the Plaintiff is in the interest of all parties with a claim to the Vessel or the proceeds of her sale.

Plaintiff also respectfully requests that the Court allow Plaintiff, in consultation with and subject to the approval of the U.S. Marshal Service for the District of Rhode Island, to arrange the advertising for the Vessel. Specifically, Plaintiff submits that advertising of the sale of the Vessel in specialty shipping publication is more likely to reach prospective purchasers than advertising in local media. Accordingly, Plaintiff respectfully requests that the Court allow Plaintiff to advertise the sale of the Vessel, should the instant motion be granted.

## CONCLUSION

Under the circumstances of this case, it is respectfully submitted that equity demands the interlocutory sale of the Vessel, her engines, tackle, appurtenances, bunker fuel, furniture, rigging, etc., on an expedited basis. The Owner has not posted security for the release of the Vessel, or even appeared in this action, and Owner's counsel in the First Litigation has withdrawn from that case (even though that case has been over for 6 months). The daily cost of maintaining the Vessel during her arrest is diminishing the proceeds which will be available from her ultimate sale and therefore is necessarily reducing the amount of money available to satisfy judgment in this case. In light of the foregoing, further delay in the sale of the Vessel is unwarranted, and an interlocutory sale is therefore appropriate.

Plaintiff RBS, respectfully asks this Court to issue an Order:

1. directing the sale of M/T STAVRODROMI, her engines, tackle, appurtenances, bunker fuel, furniture, rigging, etc.;

2. setting a minimum price of $6,250,000 for the Vessel;

3. directing that the deposit placed by the winning bidder be set at $6,250,000, representing 10% of minimum price;

4. allowing Plaintiff in coordination with, and subject to the approval of, the U.S. Marshal, to advertise the sale of the Vessel; and

5.  granting Plaintiff all other relief to which it may be justly entitled.

Dated:  November 23, 2011

RESPECTFULLY SUBMITTED, Plaintiff The Royal
Bank of Scotland, N.V., by its Attorneys,


/s/Stephen P. Sheehan
Stephen P. Sheehan  #4030
Wistow & Barylick Inc.
61 Weybosset Street
Providence RI 02903
Phone: (401)831-2700
Fax: (401)272-9752
Email: spsheehan@wistbar.com

OF COUNSEL:
Neil A. Quartaro, admitted *pro hac vice*
Watson, Farley & Williams (New York) LLP
1133 Avenue of the Americas, 11th Floor
New York, N.Y. 10036
Phone (212) 922-2200
Fax (212) 922-1512
nquartaro@wfw.com

## CERTIFICATION

I hereby certify that an exact copy of the within document was electronically mailed to the Electronic Case Filing system of the United States District Court for its distribution to all counsel of record on this 23rd day of November, 2011 to the following:

Samuel P. Blatchley, Esq.
Partridge, Snow & Hahn, LLP
180 South Main Street
Providence, RI  02903
spb@psh.com

George M. Chalos, Esq.
Chalos & Co., P.C.
123 South Street
Oyster Bay, NY  11771
gmc@chaloslaw.com


/s/Stephen P. Sheehan